UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

**LUCIA F. BOTELHO,**
    Plaintiff,

    v.                                                     **CIVIL ACTION NO. 15-11778-MPK[1]**

**CAROLYN COLVIN, ACTING**
**COMMISSIONER OF THE**
**SOCIAL SECURITY**
**ADMINISTRATION,**
    Defendant.

**MEMORANDUM AND ORDER ON**
**PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS (#10) AND**
**DEFENDANT'S MOTION TO AFFIRM COMMISSIONER'S DECISION (#13).**

KELLEY, U.S.M.J.

I.    Introduction

Plaintiff Lucia F. Botelho seeks reversal of the decision of Defendant Carolyn Colvin, Acting Commissioner of the Social Security Administration ("SSA"), denying her Disability Insurance Benefits ("DIB"). (#10.) Defendant moves for an Order affirming the Commissioner's decision. (#13.) With the administrative record having been filed and the issues fully briefed (##7, 11, 12), the cross motions stand ready for decision.

II.    Background

    A.    Procedural History

Plaintiff applied for DIB on February 29, 2012. (TR at 315-316.)[2] She alleged that she became disabled on December 16, 2010, due to lupus; chronic pain in muscles, joints, and

---

[1] With the parties' consent, this case was reassigned to the undersigned for all purposes, including trial and the entry of judgment, pursuant to 28 U.S.C. § 636(c). (#9.)

[2] "TR" refers to the Administrative Record. (#7.)

1

nerves; fatigue; depression; and anxiety. (TR at 210.) Her applications were denied initially (TR at 236-238) and upon reconsideration. (TR at 240-242.)

Botelho filed a written request for a hearing on December 3, 2012. On October 31, 2013, a hearing was held before Administrative Law Judge ("ALJ") Stephen C. Fulton. (TR at 39-75.) At the hearing, ALJ Fulton heard testimony from Plaintiff and James F. Scorzelli, Ph.D., a vocational expert. (TR at 23.) On December 23, 2013, the ALJ found Plaintiff not disabled. (TR at 20-38.) Plaintiff requested review by the Appeals Council on January 21, 2014 (TR at 18), but was denied on March 6, 2015. (TR at 1-7.) As a consequence of the denial, the ALJ's decision *de facto* became the final decision of the Acting Commissioner, subject to judicial review under 42 U.S.C. § 405(g). Plaintiff filed the instant case in federal court on May 5, 2015. (#1.) She has not challenged the ALJ's findings on her mental limitations, only his determination of her physical impairments. (#11 at 2 n.4.)

### B. Factual History

#### 1. Medical Records

Plaintiff's relevant medical history begins on August 1, 2008, when she was hospitalized following one month of symptoms including daily fevers of up to 103 degrees, chills, drenching sweats, weakness, vomiting, headaches, decreasing appetite, a rash, and weight loss. (TR at 385, 392.) She was tentatively diagnosed with systemic lupus erythematosus ("SLE") before being discharged on August 5, 2008. (TR at 373-388.)

On December 4, 2008, Plaintiff was seen by Bonnie Lee Bermas, M.D. "in consultation for possible diagnosis of systemic lupus erythematosus." (TR at 493.) On this date Dr. Bermas noted that Plaintiff had "diffuse alopecia;" she had no skin rashes or lymphadenopathy; her lungs were clear; her hands appeared normal and had good grip strength; her fingers, elbows,

shoulders, and wrists had a good range of motion; her ankles were "fine;" and her muscle strength was "5/5." (*Id.*) Plaintiff was taking CellCept, prednisone, hydroxychloroquine, and hydrochlorothiazide. (*Id.*) Lab testing showed her kidney function was "slightly better" than it had been in the hospital. (TR at 480.)

On January 29, 2009, Dr. Bermas saw Plaintiff for headache, sinus infection, and bloating. (TR at 492.) Dr. Bermas wrote: "Skin is without rashes. No lymphadenopathy. Lungs are clear. Cardiac exam is normal. Abdomen is benign. Examination of her joints reveals normal-appearing hands, good grip strength, normal DIPs, PIPs, MCPs, wrists, elbows, shoulders, hips, knees and ankles within normal limits."[3] Dr. Bermas also noted that Plaintiff's "Lupus is stable." (*Id.*) Dr. Bermas increased the dose of CellCept and decreased the prednisone. (*Id.*) Lab testing showed "some mild proteinuria." (*Id.*).

On March 12, 2009, Dr. Bermas saw Plaintiff for "followup of her lupus." (TR at 482.) Plaintiff was "noticing more and more joint pain," had continuing headaches, swollen and painful hands, and wore an ankle brace. (*Id.*) Plaintiff was taking CellCept, clobetasol, fioricet, hydrochlorothiazide, hydroxychloroquine, and prednisone. (*Id.*) Despite these increased symptoms, Dr. Bermas again noted "Lupus is stable," and wrote that "Examination of her joints reveals normal-appearing hands, good grip strength, normal DIPs, PIPs, MCPs… and ankles within normal limits." (*Id.*) She deferred adjusting Plaintiff's medication until after her appointment with a renal specialist. (*Id.*)

On the same date, Plaintiff was seen by Johannes Schlondorff, M.D., Ph.D., a renal specialist, for "lupus with proteinuria." (TR at 486.) He noted that Plaintiff had "SLE with possible renal involvement," but was unable to determine if her kidneys were affected by lupus

---

[3] Dr. Bermas repeated this exact language in her notes from each of Plaintiff's subsequent appointments.

or by another cause. (TR at 487.) On April 2, 2009, Dr. Schlondorff reviewed Plaintiff's medical records, and recommended "close monitoring and renal biopsy" only if her condition worsened. (TR at 483.)

On May 21, 2009, Dr. Bermas saw Plaintiff for "followup of her lupus." (TR at 482.) Dr. Bermas again noted "Lupus is stable," and mentioned that Plaintiff's right ankle had "some decreased" range of motion.[4] (*Id.*) Despite this, she again wrote that her "ankles [were] within normal limits." (*Id.*) Dr. Bermas prescribed lisinopril and discontinued prednisone. (*Id.*) Labs showed Plaintiff's kidney function was "slightly better" than the previous test. (TR at 480.)

On August 24, 2009, Dr. Bermas saw Plaintiff for mouth sores, headaches, and slurred speech. (TR at 479.) Dr. Bermas again noted "Lupus is stable." (*Id.*) Labs showed "the kidney function tests are better." (TR at 477.)

On November 19, 2009, Dr. Bermas saw Plaintiff for swollen hands, arm stiffness, diarrhea, occasional mouth sores and chest pain, headaches, and tiredness. (TR at 476.) Dr. Bermas again noted "Lupus is stable." (*Id.*) Labs showed increased protein in Plaintiff's urine. (TR at 474.)

On February 4, 2010, Plaintiff had breast reduction surgery due to back and neck pain. (TR at 440-441, 472, 495.) She "tolerated the procedure without difficulty" and had an "uneventful" postoperative period. (TR at 441.) On February 10, March 17, and July 7, 2010, Plaintiff was seen for follow-up by Bohdan Pomahac, M.D., who noted that she had "nicely healed" from the procedure. (TR at 469-471.)

On March 21, 2011, Dr. Bermas saw Plaintiff for weight loss and feeling "worse" after having been unable to afford her medication for four months. (TR at 464.) Dr. Bermas again

---

[4] Dr. Bermas also repeated this exact language in her notes from each of Plaintiff's subsequent appointments.

noted "Lupus is stable." (*Id.*)  Labs showed protein in her urine, and Dr. Bermas prescribed CellCept, hydroxychloroquine, and lisinopril. (TR at 463-64.)

On November 10, 2011, Dr. Bermas saw Plaintiff for lupus symptoms including hair loss, "rare mouth sores," and joint pain. (TR at 461.) Dr. Bermas again noted "Lupus is stable." (*Id.*) Labs showed protein in Plaintiff's urine, and Dr. Bermas prescribed lisinopril. (TR at 458.)

On March 1, 2012, Dr. Bermas saw Plaintiff for lupus symptoms including "a lot of pain… stiffness, she feels as if her nerve [endings] are bothering her. Right thumb is stiff. No fluid retention. Some headaches, minimal skin lesions, no chest pain." (TR at 455.)  Dr. Bermas again noted "Lupus is stable," and wrote that Plaintiff's hands were "normal." (*Id.*)  Labs on this date revealed that Plaintiff "still [had] a little bit of protein" in her urine. (TR at 454.)

On June 28, 2012, Dr. Bermas saw Plaintiff for syncopal episodes, occasional sun rashes and open sores, joint pain, difficulty with daily activities, weight gain, and insomnia. (TR at 513.)  Despite noting rashes and open sores, Dr. Bermas repeated the same text that appears in every record, "Skin is without rashes." (*Id.*)  Dr. Bermas again noted "Lupus is stable." (*Id.*) Plaintiff was taking CellCept, Celexa, clobetasol propionate, hydroxychloroquine, lisinopril, and prednisone. (*Id.*)  Labs on this date revealed that Plaintiff had "a little bit more protein" in her urine. (TR at 512.)

On January 10, 2013, Dr. Bermas saw Plaintiff for rashes on her arms, legs, and head; hair loss; pain with numbness in her neck and right arm; low energy and insomnia; persistent headaches that Motrin and Tylenol did not help; depression; stomach pain and heartburn; and forgetfulness. (TR at 525.) Again, despite mentioning Plaintiff's rashes, Dr. Bermas reported, "Skin is without rashes." (*Id.*) Labs on this date revealed "a bit more protein" in Plaintiff's urine, and Dr. Bermas referred her to a renal specialist. (TR at 524.) For the first time, instead of

5

deeming the lupus "stable," Dr. Bermas stated: "Patient is more symptomatic – unclear if this is sle refractory to therapy or this is depression." (*Id.*)  Dr. Bermas referred her to Jean Pegg, LMHC, for mental health. (TR at 580-582.)[5]

### 2. Medical Opinions

On April 18, 2012, Michelle D. Holmes, M.D., an advising physician to the Disability Determination Service, found Plaintiff not disabled on initial consideration. (TR at 219, 221.) Dr. Holmes determined that Plaintiff could "lift up to 20 pounds occasionally and 10 pounds frequently, sit for six hours, and stand or walk for six hours in an eight-hour workday."[6] (TR at 29, 216-219.)

On June 14, 2012, Plaintiff had a consultative examination with Richard Vinacco Jr., Psy.D. (TR at 500-504.)  In this exam, she "denied difficulty showering, dressing, or grooming herself." (TR at 501.)  She said she could stand for 15 minutes, walk for 30 minutes, and sit, bend, and lift 20 pounds. (TR at 501.)  She could prepare cold meals, cook, and use the stove. (TR at 501.)  She lost focus while driving, but sometimes drove herself. (*Id.*)  She could plan budgets, maintain checkbooks, and pay bills on time. (*Id.*)

On September 27, 2012, John Benanti, M.D., an advising physician to the Disability Determination Service, reviewed updated information about Plaintiff's health on reconsideration. Like Dr. Holmes, Dr. Benanti determined that she could "lift up to 20 pounds occasionally and 10 pounds frequently, sit for six hours, and stand or walk for six hours in an eight-hour

---

[5] Because Plaintiff has not challenged the ALJ's findings on mental limitations, neither her mental health records nor the opinions of the Disability Determination Service's advising psychologists and psychiatrist are discussed here.

[6] Although the ALJ wrote that Dr. Holmes had indicated that Botelho should avoid humidity, this does not appear to be mentioned in the cited source. (TR at 29, 210-220.)

workday." (TR at 30, 228.)  Dr. Benanti also recommended that Plaintiff "avoid concentrated exposure to humidity." (TR at 229.)

On February 4, 2013, Dr. Bermas completed a "Multiple Impairment Questionnaire" for Plaintiff. (TR at 556-563.)  This questionnaire was only partially completed, but indicated that Plaintiff's primary symptoms were fatigue, daily joint pain, and swelling. (TR at 557.)  Dr. Bermas indicated that Plaintiff would need daily unscheduled breaks of 15 minutes, and would need to be absent from work more than three times per month. (TR at 561-562.)

On September 27, 2013, Dr. Bermas completed a "Lupus (Systemic Lupus Erythematosus) Impairment Questionnaire" for Plaintiff. (TR at 572-578.)  On it, Dr. Bermas noted that her primary symptoms were fever, headache, nausea, fatigue, and facial rash. (TR at 574-575.)  She indicated that Plaintiff would be able to lift up to 5 pounds occasionally, carry up to 10 pounds occasionally,[7] and sit for two hours and stand or walk for one hour in an eight-hour workday. (TR at 575-576.)  Dr. Bermas also wrote that Plaintiff would need three daily unscheduled breaks of 15 minutes, and would need to be absent from work two to three times per month. (TR at 577.)  She did not check boxes indicating that Plaintiff would need to avoid humidity or wetness. (*Id.*)

### 3. Hearing Testimony

According to her testimony at the administrative hearing, Plaintiff was born in 1977 and was 36 years old on the hearing date. (TR at 44.)  She earned an associate's degree in early childhood development, and worked as a teaching assistant from 1999-2003, a fitness consultant from 2003-2008, and a parent-child advocate from 2008-2010.[8] (TR at 44-50.)  Plaintiff has not

---

[7] Dr. Bermas did not explain her opinion that Plaintiff could carry more weight than she could lift.

[8] Plaintiff listed different dates on her Work History Report, but the differences are not relevant here. (TR at 340.)

worked since December 2010, although she applied for multiple jobs. (TR at 53-54.)  Plaintiff was laid off from work because she was calling out sick for up to two weeks at a time. (TR at 53.)  She described chronic pain and fatigue that made her unable to get out of bed or get dressed. (TR at 54.)  The pain affected her right shoulder, especially when reaching above shoulder level, and "restricts me from doing a lot more things where I'm right-handed." (TR at 56, 63.)  Although Plaintiff had been referred to a physical therapist, she did not go because she could not afford co-payments. (*Id.*)  She took Motrin and Tylenol "constant[ly]" for the pain, Celexa for depression and anxiety, and "numerous… constant medications" for her lupus. (TR at 55, 57.)  However, none of these medications improved her lupus symptoms or pain. (TR at 57.)  Her pain was daily, "head to toe between chronic headaches, no fine motor skills at this point." (TR at 58.)  On a typical day, her pain ranged between 7 to 9 out of 10. (TR at 59.)  She had chronic fatigue, which caused her to "literally fall asleep at any point in time" and to pass out approximately once weekly. (TR at 59-60.)  Passing out was brought on by stress or exertion, and caused her to hit her head on furniture, fall down stairs, and fall out of the shower. (TR at 60-61.)

      Plaintiff reported her daily activities consisted of spending most of the day lying down and resting. (TR at 61.)  Her use of her fingers and hands was limited, affecting her ability to do household chores such as laundry, cooking, dishes, and folding clothes; to drive a car; and to hold a pencil. (TR at 58, 62.)  She reported difficulty with opening bottles and jars, opening doors, and lifting items. (TR at 62.)  Sitting at the computer and focusing on the screen gave her a headache, and typing was difficult. (TR at 63.)  She reported difficulty with sitting still, standing, or walking for long periods of time. (TR at 64.)  She had to stop and rest on the stairs in her home because of balance issues and pain in her knees and back. (TR at 65.)  She drove "not

often anymore." (*Id.*) She went days at a time without being able to shower. (TR at 66.) Her depression caused her to "become a hermit," and "sit home and do nothing." (TR at 66.) She had crying spells, difficulty controlling her emotions, difficulty staying focused and concentrating especially when helping her children with their homework. (TR at 67.) Because of her forgetfulness, she needed to write lists "for everything." (TR at 68.) In terms of childcare, cooking for her daughters, doing their laundry, and going to softball games was difficult for her. (TR at 68.)

The vocational expert[9] testified that Ms. Botelho's past work as a teaching assistant was medium, semi-skilled, based on her testimony; as a parent child advocate was light, skilled; and as a fitness consultant was medium, skilled. (TR at 70.) He testified that a person with Plaintiff's work history and education who could understand and remember simple instructions, could concentrate for 2-hour periods over an 8-hour day on simple tasks, could interact appropriately at work, and could adapt to changes in the workplace would not be able to do Plaintiff's past work. (TR at 70-71.) However, he testified that such a person could be an usher, mail clerk, or cashier, which are light, unskilled, simple jobs. (TR at 71.) He further testified that a person with Plaintiff's work history and education who could occasionally lift 5-10 pounds; could stand, walk, or sit 10 minutes at a time; could "less than occasionally" grasp or twist items; needed unscheduled breaks totaling 2 or more hours over an 8-hour period; and would need to be off-task greater than 20 percent of the day would be completely unable to work. (TR at 71-72.) A person who could sit for up to two hours, and stand or walk for up to one hour, in an 8-hour period would be unable to work. (TR at 72.) A person who had to be absent from work 2-3 times a month would not find any jobs available. (TR at 72-73.)

---

[9] This person's name was not captured in the transcript, but the ALJ indicated it was James F. Scorzelli, Ph.D. (TR at 23.)

4. Function Report

On May 6, 2012, Plaintiff filled out a "Function Report – Adult" detailing her daily activities and limitations. (TR at 332-339.) Plaintiff, a single mom, said she "do[es] everything for" her children. (TR at 333.) In the morning, she got her kids ready for school; rested until noon, when she did housework; at night, she prepared dinner and helped her children with homework, bathing, and getting to bed. (TR at 332.) She also cared for her pets, giving them food and water, letting the dog out, and changing litter and cage bedding. (TR at 333.) On bad days, she was unable to get dressed; on good days, she "tend[ed] to dress down due to pain." (*Id.*) She noted that it was difficult to brush her teeth, clip her toenails, or put on makeup. (*Id.*) Plaintiff reported preparing food daily, although she "tend[ed] to lean more to fast food or frozen." (TR at 334.) She did housework including light cleaning, laundry, and loading the dishwasher. (TR at 334.) Plaintiff was able to drive, although she did not like to go alone; she shopped weekly or biweekly for food, household items, clothes, and toiletries; and she handled her own bank accounts and finances, although she reported having to double or triple check her work. (TR at 335-336.) She regularly went to sporting or school events for her children, and attended church. (TR at 336.) She could walk 10-20 feet before needing to stop and rest. (TR at 337.)

III. Standard of Review

Title 42 U.S.C. § 405(g) provides, in relevant part:

> Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may allow… The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause

>for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive…

The court's role in reviewing a decision of the Commissioner under this statute is circumscribed:

>We must uphold a denial of social security disability benefits unless 'the Secretary has committed a legal or factual error in evaluating a particular claim.' *Sullivan v. Hudson*, 490 U.S. 877, 885, 109 S. Ct. 2248, 2254, 104 L. Ed. 2d 941 (1989). The Secretary's findings of fact are conclusive if supported by substantial evidence. *See* 42 U.S.C. § 405(g); *see also Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971).

*Manso-Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996); *see Reyes Robles v. Finch*, 409 F.2d 84, 86 (1st Cir. 1969) (holding that "as to the scope of court review, 'substantial evidence' is a stringent limitation").

The Supreme Court has defined "substantial evidence" to mean "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *and see Irlanda Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991). It has been explained that:

>In reviewing the record for substantial evidence, we are to keep in mind that 'issues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the Secretary.' The Secretary may (and, under [her] regulations, must) take medical evidence. But the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for [her], not for the doctors or for the courts. We must uphold the Secretary's findings in this case if a reasonable mind, reviewing the record as a whole, could accept it as adequate to support [her] conclusion.

*Lizotte v. Sec'y of Health & Human Servs.*, 654 F.2d 127, 128 (1st Cir. 1981) (quoting *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981)). In other words, if supported by substantial evidence, the Commissioner's decision must be upheld even if the evidence could also arguably admit to a different interpretation and result. *See Ward v.*

*Commissioner of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000); *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

Finally, it has been noted that:

> Even in the presence of substantial evidence, however, the Court may review conclusions of law, *Slessinger v. Sec'y of Health & Human Servs.*, 835 F.2d 937, 939 (1st Cir. 1987) (per curiam) (citing *Thompson v. Harris*, 504 F. Supp. 653, 654 [D. Mass.1980]), and invalidate findings of fact that are 'derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts,' *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

*Musto v. Halter*, 135 F. Supp. 2d 220, 225 (D. Mass. 2001).

IV. <u>Discussion</u>

In order to qualify for DIB, a claimant must prove that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Here, in determining Botelho's eligibility for benefits, the ALJ conducted the familiar five-step evaluation process to determine whether an adult is disabled. *See* 20 C.F.R. § 404.1520(a); *Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982); *Veiga v. Colvin*, 5 F. Supp. 3d 169, 175 (D. Mass. 2014). In conducting this test, the ALJ concluded that 1) Plaintiff had not engaged in substantial gainful activity since December 16, 2010; 2) Plaintiff had severe impairments of systemic lupus erythematosus, depression, and anxiety; 3) Plaintiff did not have an impairment or combination of impairments that met or medically equaled those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; 4) Plaintiff retained the residual functional capacity to: understand and remember simple instructions, concentrate on simple tasks for two-hour periods in an eight-hour day, interact appropriately with coworkers and supervisors, and adapt to changes in the work setting, although she needed to avoid concentrated exposure to humidity; 5)

Plaintiff was unable to perform any past relevant work, but could perform jobs that existed in significant numbers in the national economy; and 6) Plaintiff was not under a disability from December 16, 2010, through December 23, 2013. (TR at 25-34.)

### A. Weight of Medical Opinions

Plaintiff argues that the ALJ improperly weighed the medical evidence because he credited the opinions of the non-examining state consultants over the opinion of Dr. Bermas, Plaintiff's treating rheumatologist. Plaintiff believes that Dr. Bermas' opinion should have been given controlling weight. She argues that the consulting physicians did not have access to Dr. Bermas' opinions or the medical records from late 2012 and early 2013.

Plaintiff is correct that opinions of treating physicians usually receive more weight, because they "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." *King v. Colvin*, No. 14-10380, 2015 WL 5315189, *14 (D. Mass. Sept. 11, 2013) (citing 20 C.F.R. § 416.927(c)(2)) (internal quotation marks omitted).  However, the ALJ may "downplay the weight afforded a treating physician's assessment of the nature and severity of an impairment where ... it is internally inconsistent or inconsistent with other evidence in the record including treatment notes and evaluations by examining and nonexamining physicians." *Viveiros v. Astrue*, No. 10-11405, 2012 WL 603578, at *6 (D. Mass. Feb. 23, 2012) (quoting *Arruda v. Barnhart*, 314 F. Supp. 2d 52, 72 (D.Mass.2004), and citing 20 C.F.R. § 404.1527(d)(2)-(4)).  If the ALJ does not give controlling weight to a treating source opinion,

> the ALJ considers an array of factors to determine what weight to grant the opinion, including the length of the treatment relationship and the frequency of examination, the

nature and extent of the treatment relationship, the degree to which the opinion can be supported by relevant evidence, and the consistency of the opinion with the record as a whole. *See* 20 C.F.R. § 404.1527(c)(2)-(6); 416.927(c)(2)-(6). Further, the regulations require adjudicators to explain the weight given to a treating source opinion and the reasons supporting that decision. *See* 20 C.F.R. § 404.1527(c)(2); 416.927(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").

*Bourinot v. Colvin*, No. 14-40016, 2015 WL 1456183, at *11-12 (D. Mass. Mar. 30, 2015); *and see Conte v. McMahon*, 472 F. Supp. 2d 39, 48 (D. Mass. 2007), *and Walker v. Barnhart*, No. 04-11752, 2005 WL 2323169, at *18 (D. Mass. Aug. 23, 2005) (The ALJ must "accept[] or explicitly discredit[]...the record evidence from [the claimant] and her treating physician"). Finally, this Court must uphold the ALJ's decision as long as a "reasonable mind, reviewing the record as a whole, could accept it as adequate to support his conclusion." *Monroe v. Barnhart*, 471 F. Supp. 2d 203, 211-12 (D. Mass. 2007) (quoting *Lizotte*, 654 F.2d at 128 (internal citations omitted)).

Here, the ALJ gave "less weight" to Dr. Bermas' opinion for two reasons: first, because her "assessments are inconsistent with the objective medical evidence of record reporting stability in [claimant's] symptoms" and second, because her "assessment is inconsistent with the claimant's reported activities of daily living, which include childcare, cooking, cleaning, shopping, reading, and attend[ing] appointments as necessary."[10] (TR at 31.) He gave "great weight" to the assessments of Dr. Holmes and Dr. Benanti, finding their assessments to be "consistent with the record as a whole." (*Id*.) Here, Dr. Bermas saw Plaintiff more frequently than any other doctor, and Dr. Bermas is the only doctor who treated Plaintiff for lupus symptoms over any significant period of time. Her notes form the bulk of the medical evidence.

---

[10] Plaintiff did not testify to all these activities at the hearing on October 31, 2013. It appears that the ALJ drew this information from her Function Report, completed on May 6, 2012. (TR at 332-339.)

14

From the evidence of record, Dr. Bermas' opinion appears both internally inconsistent and in conflict with the reviewing physicians' opinions. Examples of internal inconsistencies in Dr. Bermas' records include her repeated notations that "lupus is stable," "skin is without rashes," and joints "normal" despite Plaintiff's complaints of changing symptoms, rashes, and joint pain and stiffness. (TR at 461, 464, 455, 476, 482, 489, 513, 525.)  There were no indications in the record that Dr. Bermas disbelieved Plaintiff's reports; Dr. Bermas indicated Plaintiff was not a malingerer. (TR at 561, 576.)  In Dr. Bermas' lupus opinion questionnaire, she inexplicably indicated that Plaintiff could lift a maximum of 5 pounds, but could carry a maximum of 10 pounds.[11] (TR at 575-576.)  Beyond these discrepancies, Dr. Bermas opined that Plaintiff had much more severe limitations than the reviewing physicians indicated, without providing any details to support that conclusion. (TR at 216-219, 228-229, 575-576.)

In weighing this evidence, the ALJ offered no specific examples from the record demonstrating the purported inconsistency, in contrast with *Bourinot*, 2015 WL 1456183, at *13 ("The ALJ provided specific reasons, supported by evidence in the case record, for his decision to discount each of [three doctors' opinions]… The reasoning is sufficiently specific to inform both the claimant and this reviewing Court of how each treating source opinion was evaluated"), and *Coggon v. Barnhart*, 354 F. Supp. 2d 40, 53 (D. Mass. 2005) (inconsistency where "[i]t is not plausible that the claimant successfully lives alone, drives frequently ... and could be considered bedridden").  Here, the ALJ's opinion leaves it unclear whether he found Dr. Bermas' notes in conflict with themselves, with the reviewing physicians' opinions, or with both.  His statement "inconsistent with the objective medical evidence of record reporting stability in

---

[11] Dr. Bermas did not fill out the section of the "Multiple Impairment Questionnaire" concerning lifting limitations. (TR at 559.)

15

claimant's symptoms" does not point to discrete facts, nor does it address the internal inconsistencies in Dr. Bermas' own records.

The Court is generally unable to affirm administrative action on grounds not set forth by the agency itself; however, there is an exception to this rule when "it is clear what the agency's decision must be." *Polanco-Quiñones v. Astrue*, 477 F. App'x 745, 746 (1st Cir. 2012) (citing *MaineGeneral Med. Ctr. v. Shalala*, 205 F.3d 493, 501 (1st Cir.2000)). Where, as here, ample record evidence supports the ALJ's decision, the court may affirm it even where the ALJ's explanation is sparse. *Shaw v. Sec'y of Health & Human Servs.*, No. 93-2173, 1994 WL 251000, at *2, *5 (1st Cir. June 9, 1994) ("[W]e see no reason to return this case for the purely formulaic purpose of having the ALJ write out what seems plain on a review of the record"); *Montalvo-Velez v. Colvin*, No. 13-1827, 2015 WL 736351, at *4 (D.P.R. Feb. 20, 2015) (affirming where "the ALJ implicitly marshaled sufficient reasons for not giving [the treating physician's] opinion controlling weight"). Because Dr. Bermas' records are internally inconsistent and in conflict with the consulting physicians' opinions, it is clear that the ALJ's decision to afford those records less weight is supported by substantial evidence.

### B. Credibility Evaluation

Plaintiff argues that the ALJ erred in evaluating her credibility regarding the symptoms she experienced. She objects to his determination that her testimony was not entirely credible because she had not had surgery and the medical records reported her condition as "stable." (#11 at 12-13.) Further, Plaintiff argues that the ALJ "put a significant gloss on… her activities of daily living." (#11 at 9.)

"[T]he ALJ was not required to credit [the claimant's] testimony." *Del Rosario v. Colvin*, No. 13-30017, 2014 WL 1338153, at *7 (D. Mass. Mar. 31, 2014) (citing *Bianchi v. Sec'y of*

16

*Health and Human Servs.*, 764 F.2d 44, 45 (1st Cir.1985) (recognizing the established principle that the ALJ "is not required to take the claimant's assertions of pain at face value.")); *Tozier v. Astrue*, No. 12-10359, 2013 WL 1282371, at *4 (D. Mass. Mar. 28, 2013); *Tetreault v. Astrue*, 865 F. Supp. 2d 116, 126 (D. Mass. 2012) (an ALJ "is entitled to disbelieve subjective complaints of disabling pain in the face of contrary medical evidence."). "The First Circuit has noted that complaints of pain need not be precisely corroborated by objective findings, but they must be consistent with medical findings." *Ortiz v. Comm'r of Soc. Sec.*, 81 F. Supp. 3d 118, 126 (D. Mass. 2015) (internal citation and quotation marks omitted).

> The regulations require that a decision regarding credibility be supported by evidence:
>
> The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision….
> The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

SSR 96-7p, 1996 WL 374186, at *4. Seven factors are to be considered by an ALJ:

> (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness and side effects of any medication taken to alleviate the pain or other symptoms; (5) treatment, other than medication, received for relief of pain; (6) any other measures used to relieve pain or other symptoms; and (7) any other factors relating to claimant's functional limitations and restrictions attributable to pain. *See* [*Avery v. Sec'y of Health & Human Servs.*, 797 F.2d 19, 22 (1st Cir. 1986)]; 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii).

*Cookson v. Colvin*, –F. Supp. 3d–, 2015 WL 4006172, at *10 (D. R.I. July 1, 2015). While the ALJ is required to consider all of the Avery factors, "an ALJ is not required to discuss every factor in its decision." *Silvia v. Colvin*, No. 13-11681, 2014 WL 4772210, at *6 (D. Mass. Sept. 22, 2014); *Doshi v. Colvin*, 95 F. Supp. 3d 138, 146 (D. Mass. 2015). At bottom,

> The Court may overturn an ALJ's credibility determinations *only* when it concludes that the ALJ has ignored evidence, misapplied the law or judged medical matters that should

be left to experts. The Court may also remand cases when the ALJ has provided insufficient explanations for findings or has failed to consider relevant evidence.

*Silvia*, 2014 WL 4772210, at *7 (emphasis added).

Here, the ALJ explained in detail his rationale for disbelieving Plaintiff, including discussion of several of the *Avery* factors. First, he found that her need for medical care had been fairly minimal, consisting of appointments "three or four times per year for medication management, lifestyle modification, and observation."[12] (TR at 32.) Second, he noted no indication in the record of any persistent side effects of medication, or any significant changes in the type or dose of medication. (*Id.*) Third, he found Plaintiff's description of her limitations inconsistent with her own reports of her daily activities. (*Id.*) Finally, he noted that limitations "cannot be objectively verified with any reasonable degree of certainty" and that it was difficult to attribute the limitations to Plaintiff's medical condition "as opposed to other reasons." (*Id.*)

It is true that Plaintiff did not testify to a full range of daily activities in the hearing. The ALJ therefore relied on the activities she reported on her Function Report from May 6, 2012. (TR at 332-339.) Although Plaintiff completed the Function Report more than one year before her hearing on October 31, 2013, there is no indication in the record that her condition changed in any significant way in that time. Plaintiff did not testify that her daily activities had become more limited over the previous year. No medical records indicate that she was less able to do any of the tasks described. And on June 14, 2012, Plaintiff reported equivalent ability to perform daily activities in her consultative examination with Richard Vinacco Jr., Psy. D. (TR at 500-504.) Therefore, it was proper for the ALJ to consider the Function Report as evidence of Plaintiff's daily activities.

---

[12] This is a generous reading. The record reflects that Plaintiff had outpatient care for lupus symptoms once in 2008, five times in 2009, once in 2010, twice in 2011, twice in 2012, and once in 2013. (TR at 28-31, 385-524.) Her only hospitalization was in August 2008. (TR at 28, 370-438.)

Although the ALJ referred to surgery as one possible treatment for lupus, he did not view it as necessary to find disability. He merely noted that Plaintiff had not required significant medical management of her symptoms. The ALJ's specific findings and citations to evidence support his determination of Ms. Botelho's credibility, and that determination should not be disturbed.

V. Conclusion and Order

For all the reasons stated, it is ORDERED that Plaintiff's Motion for Judgment on the Pleadings (#10) be, and the same hereby is, DENIED. It is FURTHER ORDERED that Defendant's Motion for Order Affirming the Decision of the Commissioner (#13) be, and the same hereby is, ALLOWED. Judgment shall enter for Defendant.

/s/ M. Page Kelley
M. Page Kelley
December 18, 2015.  United States Magistrate Judge